UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
LAURA J. WILLARD,                         )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )          Civil Action No. 13-12354-LTS
                                          )
MHM CORRECTIONAL                          )
SERVICES, INC.                            )
                                          )
            Defendant.                    )
_____)


MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

November 16, 2015

SOROKIN, J.

        Plaintiff Laura J. Willard ("Willard") brings this suit against her former employer, MHM

Correctional Services, Inc. ("MHM"), stemming from her termination from MHM.  She alleges

multiple violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.,

as well as intentional infliction of emotional distress ("IIED").  Before the Court is MHM's

Motion for Summary Judgment on all of Willard's claims.  Doc. No. 53.  Willard opposed the

motion, except for the IIED claim.  Doc. No. 56.  MHM has replied to Willard's opposition, Doc.

No. 65, and the Court held a hearing on the motion.  See Doc. No. 75 (setting the date for a

motion hearing).  For the reasons that follow, MHM's Motion for Summary Judgment is

ALLOWED IN PART and DENIED IN PART.

I.      FACTS[1]

   A.      Background Facts

        Willard began working for the Department of Correction's Bridgewater State Hospital

("BSH") as a registered nurse in May, 2007.  Doc. No. 54-1 ¶ 2.  Located in Southeastern

Massachusetts, BSH houses the criminally insane and those whose sanity the criminal justice

system is evaluating.  Id.  Initially, Willard worked for BSH through the University of

Massachusetts ("UMASS") on a per diem basis.  Doc. No. 60 at 2.

        On July 1, 2007, MHM replaced UMASS as the provider of healthcare services at BSH.

Doc. No. 60-3 at 7; Doc. No. 60-7 at 16.  MHM is a leading national provider of correctional

health services to state and local government agencies.  Doc. No. 66 ¶ 1.  Among several

contracts it held with the Commonwealth of Massachusetts, MHM contracted to provide

medical, dental, and mental health services to inmates at BSH.  Id. ¶ 2.

        Pursuant to the switch from UMASS to MHM, Willard filled out an MHM application

for employment.  Doc. No. 60-4 at 1.  MHM offered her a position as a registered nurse, Doc.

No. 60-7 at 1-2, and Willard accepted on June 18, 2007.  Doc. No. 60-8 at 1.  On November 27,

2007, Willard signed the Registered Nurse position description.  Doc. No. 60-9 at 1.  MHM's

department head/supervisor also signed the document.  Id.  The position description said that

"[a]lthough all aspects of this position may not be described, I certify that this is an accurate

statement of the major responsibilities . . . ."  Id.  On October 20, 2008, Willard signed a slightly-

different position description.  Doc. No. 60-11 at 1.  Through July 11, 2011, the last evaluation

---

[1] Because of the summary judgment posture, the Court "view[s] the facts in the light most
favorable to" the non-moving Wiggins, "and draw[s] all reasonable inferences in h[er] favor."
Ray v. Ropes & Gray LLP, 799 F.3d 99, 112 (1st Cir. 2015).

on record, Willard's performance evaluations indicate that she was an exemplary employee. Doc. No. 61-1 at 1-14.

An Employee Handbook and Code of Business Conduct, containing "general information about the policies, benefits, and procedures" of working at MHM, exists as of at least October 1, 2011.  Doc. No. 55-2 at 2-3.  In the first section, it states that "the policies, requirements, and procedures contained in this Handbook are applicable to all employees" of MHM.  Id. at 6.  The attendance section provides that "attendance and punctuality are crucial for our clients and your fellow employees."  Id. at 13.  The handbook continues that "excessive absenteeism or tardiness, excused or unexcused, will lead [to] disciplinary action."  Id.  It further warns that employees who miss two consecutive days without advising their supervisor of their absence, or impermissibly leave their assigned work area/location before appropriate relief arrives, are subject to termination.  Id.

MHM entered into a Collective Bargaining Agreement ("CBA") with the Services Employees International Union, Local 1199 (the "Union") from July 1, 2007 through June 30, 2012.  Doc. No. 62-1 at 2, 11-14.  The CBA covered, inter alia, registered nurses, including Willard.  Doc. No. 66 ¶¶ 5-6.  Among other provisions, the CBA addressed scheduling, hours of work, paid days off, and overtime.  Doc. No. 62-1 at 12-13.  The Scheduling Provision stated that MHM would make every effort to provide schedules at least 30 calendar days in advance. Id. at 12.  Additionally, once posted, only mutual consent between employee and management could change the schedules.  Id.  The Hours of Work Provision provided that work shifts consisted of an 8.5 hour period, which included half an hour for lunch.  Id.  The Paid Days Off Provision allowed covered employees to accrue paid days off in accordance with the MHM

Human Resources policy.  Id. at 8.  Willard, who was working full-time, but with less than five years at MHM, earned 22.4 paid days off per anniversary year.  Doc. No. 66 at 38.[2]

Finally, the Overtime Provision provided that mandatory overtime may be necessary to meet operational needs, maintain appropriate levels of service, and provide satisfactory patient care.  Doc. No. 62-1 at 13.  To protect employees from forced overtime, the CBA constructed a hierarchy for determining when mandatory overtime was available.  Id.  The hierarchy was: "1. [A]dditional hours from part time staff; 2. PRN staff; 3. Employees who have signed up on the availability list (i.e. ["]black book") by rotating seniority; 4. Staff on duty; 5. Supervisors or other non-bargaining unit personnel; 6. Mandating."  Doc. No. 62 at 72.  MHM paid overtime workers at 1.5x their hourly rate.  Id. at 73.  However, if the overtime was mandatory overtime ("MOT"), the employee earned double her hourly rate.  Id.  In a "Position Description" MHM had prepared, MOT is not listed as a "major responsibility" of the job.  See Doc. No. 60-9 at 1.

Employees could refuse MOT assignments, but invocation carried consequences.  "A first refusal will result in a written warning, a second refusal will result in a one day suspension without pay plus a final written warning . . . and a third refusal within a rolling 12 months period will result in termination."  Doc. No. 62 at 74.  MHM had utilized this procedure to fill slots, including in 2012.  Doc. No. 62-11 at 4; see Doc. No. 61-4 at 6; Doc. No. 66 ¶ 70.  MHM had not terminated anyone, at least in recent memory, for refusing MOT shifts.  Doc. No. 62-6 at 35.  MHM generally informed employees of the CBA and mandatory overtime provisions at the time of each employee's hire.  See Doc. No. 55-5 at 43-47.

B.      Disability

---

[2] At the motion hearing, Willard's attorney acknowledged that this amount was correct.

Willard suffers from a condition known as intractable migraines, which causes her to experience frequent and painful headaches. Doc. No. 55-3 at 25.  She experienced her first migraine headache at the age of twenty-three, and her second at the age of thirty-three.  Id. at 21-23.  They increased in frequency in 2007, when she started working at BSH, id. at 23, culminating in a hospitalization that year.  Id. at 24.  Between 2007 and 2011, her headaches increased in frequency and severity, and she was again hospitalized in 2011.  Id.  Willard estimates that in 2011, she experienced between ten and seventeen migraines a month.  Id.

MHM granted Willard an extended medical leave, consisting of 12-weeks FMLA leave and an additional 30-day period, from September 16, 2011 to January 16, 2012.  Id. at 17-18; Doc. No. 55-4 at 54.  During this time, she communicated with Charles Whitney ("Whitney"), the Senior Human Resources Business Partner, to discuss receiving ADA accommodations. Doc. No. 61-2 at 2; Doc. No. 55-4 at 54.  Whitney handled FMLA leave requests, other leave requests, and requests for ADA accommodations.  Doc. No. 55-4 at 58-59.

On January 10, 2012, Willard completed MHM's Return to Work Certification ("RWC"). Doc. No. 61-2 at 3.  It required her signature.  Id.  Willard's healthcare provider, physician's assistant Brenda Gray ("Gray"), indicated the following restrictions: "No shifts >8 hrs, no lifting > 10#'s."  Id.  Gray indicated that these restrictions should last "until further notice."  Doc. No. 66 ¶ 39.  Willard emailed the completed RWC to MHM on January 11, 2012.  Id. at 4.  She returned to work on January 16, 2012.  Id. ¶ 38.  Pursuant to the RWC, MHM agreed to not subject Willard to mandatory overtime in her first thirty days back at work.  Doc. No. 54 ¶ 31.[3]

---

[3] Willard disputes that anyone told her that her exemption from MOT would only last thirty days. Doc. No. 66 at 20.  Even assuming, as the Court must, that nobody told Willard the exemption was only for thirty days, Willard does not dispute that Whitney informed Willard on February 24, 2012 that her exemption was over at that point.  Id. ¶ 54.  Accordingly, from that point forward, she was on notice that she was not exempt from MOT shifts.

C.      Accommodation Requests

On January 26, Whitney sent Willard a follow-up letter informing her of the procedure

for requesting ADA accommodations.  Doc. No. 61-3 at 6.  By letter dated February 10, 2012,

Willard requested to Whitney:

1.  Intermittent leave to the degree of 4-6 days a month for medical treatment,
    medication adjustment and rest when a migraine occurs without penalty against my
    attendance record or my performance evaluation in any way.
2.  Limited to working no more than 8 hours per day until otherwise released by my
    doctor.
3.  For my work schedule to be a set, regular, and stable schedule, so that it is not
    constantly changing as it does now.

Doc. No. 66 ¶ 40.

Additionally, Willard provided Whitney with a letter from Gray, dated February 13,

2012, which requested:

1.  Working no more than 8 hours in a 24 hour period
2.  No lifting, pulling, pushing more than 5 lbs
3.  Low stress environment
4.  Up to 4-6 days per month of unpaid leave for medical appointments.

Id. ¶ 42.

By letter dated February 24, 2012, MHM denied all of the requested accommodations in

Gray's letter.  Doc. No. 61-3 at 12.  Specifically, Whitney claimed that: (1) the four to six days

off per month would place a "considerable economic burden" on MHM; (2) the position of staff

nurse requires working more than eight hours per day to adequately staff the facility in emergent

or urgent situations; (3) there is no position in the facility that allows a five pound or less weight

restriction, especially in emergent or urgent situations; and (4) considerable stress is inherent in a

forensic state hospital run for the Department of Corrections.  Id.  Whitney concluded that

although MHM denied Willard's request, it would endeavor to find a solution.

On February 27, 2012, Willard and Whitney held a discussion about a B2 RN nursing position that Willard thought might accommodate her needs.  Doc. No. 61-4 at 7.  On March 1, 2012, Willard wrote a letter to BSH's Director of Nursing at BSH, Rhonda Cantelli ("Cantelli), expressing interest in a B2 RN position. Doc. No. 61-3 at 14. She believed this position would provide her with a more regular schedule, and would meet at least some of her needs. Doc. No. 62-4 ¶¶ 54-55; Doc. No. 55-3 at 50.  MHM wound up changing the position to a forty-hour evening shift position.  Doc. No. 66 ¶ 63.  The B2 RN position requires MOT.  Doc. No. 54-1 ¶ 37; <u>see also</u> Doc. 55-3 at 43 (noting that Whitney "didn't go as far as" telling Willard that she "would not have to work overtime").[4]

D.    <u>After the Initial Denial</u>

On or about February 29, 2012, after Willard's day shift supervisor told her that she was to work an overtime shift, and after Willard worked the first two hours of that shift, Willard left the facility.  Doc. No. 66 ¶ 72.[5]  On March 8, 2012, MHM notified Willard that she was next on the list for mandatory overtime.  Doc. No. 61-4 at 2.  Willard refused to cover the shift or arrange for a suitable replacement.  <u>Id.</u>  On that same day, in a handwritten note to Cantelli, Willard stated that she was not voluntarily going against her doctor's orders, but that she would work the overtime if MHM would put in writing that she must ignore her doctor's recommendations.  <u>Id.</u>

---

[4] Willard claims that Whitney incorrectly said the B2 RN position required MOT, as she asserts that she would not have applied for it if it failed to meet her needs.  Doc. No. 66 at 17.  However, she does not offer any evidence to counter Whitney's testimony, Doc. No. 51-4 ¶ 37, or her own deposition acknowledging that Whitney never told her the B2 RN job did not require overtime. Doc. No. 55-3 at 43.  Even at summary judgment, Willard's bare conclusory allegation alone cannot overcome this evidence.

[5] Willard's dispute about this particular fact is solely that she found a replacement, and tat MHM did not have to make special arrangements to find one.  She does not dispute that her supervisor assigned her MOT, and that she left before completing that shift.

at 3.  Willard made explicit this was a medical issue, and that she was not using, pursuant to the

CBA, one of her three MOT refusals.  Id.

That same day, Whitney drafted a document entitled "Laura Willard Chronology." Doc.

No. 61-4 at 7-8. In it he catalogued her FMLA leave, 30-day extension, and ADA

accommodation request.  Id.  Specifically, he wrote that she sent MHM a letter, requesting:

- 4-6 unpaid unplanned days off each month – without it having any disciplinary
  impact on her attendance (when I asked Ms. Willard she confirmed that this would
  indeed be inclusive of episodes of her illness plus doctor's appointments)
- Exemption from forced overtime permanently
- A low stress environment
- A 5 pound weight lifting restriction

Id.  Whitney concluded that he did not believe she would compromise on the issues of time off

or exemption from mandatory overtime.  Id.

On March 12, 2012, Willard sent Whitney an email stating that she could not work any

overtime, could not work beyond an eight-hour shift, and refused to go against her doctor's

orders.  Doc. No. 66 ¶ 77.  She further stated in the email that she would file a grievance with the

union and the Equal Employment Opportunity Commission ("EEOC").  Id.  Other than the two

MOTs, Willard only took two unplanned personal days off after coming back to work in January,

2012.  Doc. No. 62-7 at 2-6.

On or about the next day, Cantelli and BSH Hospital Administrator Susan Lantagne

("Lantagne") met with Willard, informed her that MHM could not meet her requests, and asked

her to leave the building.  Doc. No. 66 ¶ 78; see id. ¶ 43 (stating Lantagne's MHM position).  In

the days that followed, Whitney made multiple attempts to discuss the situation with Willard.

Doc. No. 61-4 at 10, 13.  On March 20, 2012, Willard informed MHM that she would not discuss

anything more.  Id. at 14.

On March 22, 2012, Whitney sent Willard a letter informing her that MHM had terminated her employment.  Id.  Additionally, he detailed her ADA requests and explained why MHM could not accommodate them.  Specifically, Whitney wrote that: (1) allowing 4-6 days of unexpected leave per month was unacceptable because regularly working a specific, predetermined schedule is an essential function of a registered nurse, and unexpected absences place a considerable burden on MHM and its remaining staff; (2) the exemption from mandatory overtime was unacceptable because mandatory overtime is an essential function, as understood when Willard accepted the position, and any exemption would place an undue burden on MHM and its other employees; (3) the request to never lift, pull or push more than five pounds could not be met, as no nursing position at BSH fulfills that constraint, especially during emergent or urgent situations; and (4) the request to work in a low stress environment cannot be met because a forensic state hospital is inherently stressful.  Id. at 14-15.

On May 31, 2012, before the Union had evaluated Willard's case, MHM informed the Union that it would offer Willard back wages, between the time she was suspended without pay and the time when she was terminated, for a full waiver of all potential future claims.  Doc. No. 62-3 at 3.  On June 20, 2012, the Union conveyed MHM's offer and wrote that "after examining your case, the Union doesn't believe that we will prevail in arbitration…. You were not terminated for cause."  Id. at 4.  It recommended that Willard accept MHM's offer.  Id.

Willard also contacted the EEOC regarding her situation.  Doc. No. 62-2 at 2.  In a letter to MHM, on June 4, 2013, the EEOC found that "[t]here is no dispute that [Willard] asked for reasonable job accommodations from [MHM] in February of 2012 and was denied reasonable job accommodations."  Id.  In reaching this conclusion, the EEOC determined that "there is no evidence that [MHM] considered [Willard] for other position(s)… which she is qualified for,"

even if those positions are considered a demotion.  Id. at 3.  The EEOC also found that MHM's

offer of back wages for a waiver of future claims violated public policy and was facially

retaliatory.  Id.[6]  By letter dated August 9, 2013, the EEOC denied MHM's request for

reconsideration.  On September 21, 2013, Willard filed this suit.  Doc. No. 1 at 12.

II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of h[er]

pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v.

Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to review the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).

---

[6] The Court recognizes that, notwithstanding the EEOC proceedings, it reviews the facts and the law de novo.  See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 474 (1982) ("[T]he requirement of a trial de novo in federal district court following EEOC proceedings was added primarily to protect employers from overzealous enforcement by the EEOC.").

III.     DISCUSSION

Willard's Amended Complaint alleges three claims for relief against MHM: (1) violation

of the ADA for failure to give her a reasonable accommodation, and terminating her when she

refused to work without one; (2) retaliation against her, in violation of the ADA; and (3) IIED.

See Doc. No. 5 at 11-12.  MHM moves for summary judgment on all counts.  See Doc. No. 53.

Willard does not oppose MHM's motion for the IIED claim.  See Doc. No. 56 at 3.

Nevertheless, because "[i]t is well-settled that 'before granting an unopposed summary judgment

motion, [this Court] must inquire whether the moving party has met its burden,'" Aguiar-

Carrasquillo v. Agoso-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) (quoting Lopez v. Corporacion

Azucarera de Puerto Rico, 938 F.2d 1510, 1517 (1st Cir. 1991)), the Court considers all three

claims.

A.     Count I—ADA Claim

Willard's first claim against MHM is that MHM "refused to provide reasonable

accommodations and terminated [her] because of her disability."  Doc. No. 5 ¶ 65.  For the sake

of thoroughness, the Court treats this claim as positing two theories of liability for MHM: 1) the

failure to reasonably accommodate Willard; and 2) firing Willard because of her disability.

Further, in her opposition, Willard alluded to MHM "discriminat[ing] against [her] in hiring by

refusing to consider her application for the B2 RN position based on its perception of her as

disabled."  Doc. No. 56 at 7.  The Court examines these three theories in turn.[7]

---

[7] At the motion hearing, Willard reasserted her position that MHM failed to engage in the
interactive process.  Even if true, to the extent she asserts this failure as an independent ADA
violation, that theory is unavailing.  An employer's failure to engage in the interactive process
can establish that the employer failed to reasonably accommodate the employee.  EEOC v.
Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014).  That showing, however, does not
absolve Willard of the obligation to fulfill all three elements of the claim.  Id.  As explained
below, she fails to meet this burden.

1) Failure to Reasonably Accommodate

To survive summary judgment on the reasonable accommodation theory, Willard must offer sufficient "evidence for a reasonable jury to find that (1) [s]he is disabled within the meaning of the ADA, (2) [s]he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [MHM], despite knowing of [her] disability, did not reasonably accommodate it." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007) (internal quotations omitted). MHM argues that Willard, inter alia, did not "show that she could perform the essential functions of the position with or without a reasonable accommodation." Doc. No. 54 at 1. As the Court explains below, Willard cannot demonstrate that she could perform the essential function of MOT, and so this claim fails.[8]

"An essential function is a fundamental job duty of the position at issue," and "does not include the marginal functions of the position." Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (internal citations and quotations omitted). EEOC regulations point to such factors as "[t]he employer's judgment" and "terms of a collective bargaining agreement" as "evidence of whether a particular function is essential." See 29 C.F.R. § 1630.2(n)(3).[9]

The first issue to resolve is what exactly Willard requested regarding overtime. While the record contains numerous references to Willard's desire to work no more than eight hours during any twenty-four hour period, see, e.g., Doc. No. 66 ¶¶ 40, 42, 54, the parties both focused a large amount of their effort on the importance of mandatory overtime, both in their papers, and

---

[8] Because the Court grants summary judgment for MHM on this basis, it is unnecessary to analyze the other requested accommodations.

[9] The Court recognizes that "[s]uch administrative interpretations of the [ADA] by the [EEOC], 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants my properly resort for guidance.'" Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 672 (1st Cir. 1995) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

at the motion hearing.  See, e.g., id. ¶ 96; Doc. No. 56 at 6.  Further, Whitney's chronology described Willard's request as "[e]xemption from forced overtime permanently."  Doc. No. 61-4 at 6.  In light of this, given the summary judgment posture, the Court construes Willard's request as the latter, that she merely asked for an exemption from MOT.[10]

The parties do not dispute that, generally speaking, overtime is very important.  Doc. No. 66 ¶¶ 95, 99-100, 102.  Given that Willard worked in the medical sector—where patient needs do not always fit a regular schedule—with an employer contractually obligated to fill a certain number of slots, overtime's importance becomes all the more apparent.  Willard raises two arguments to try and get around this.  Both come up short.

First, Willard argues that MOT is not an essential function because it is simply a staffing mechanism and the sixth of six mechanisms for filling overtime slots.  See Doc. No. 56 at 6.  Going off this, Willard presents a statistical analysis showing that MHM rarely uses MOT, further showing how unessential it is.  See Doc. 62-11.  Even assuming the statistics' validity, Willard still has not shown that MOT is not an essential function, as the statistics indicate that MHM does in fact use it to fill slots.  Willard's two MOTs after returning to work further bolster this conclusion.  The fact that MHM uses MOT even when MOT pays more than any of the other mechanisms, see Doc. No. 62 at 73, underscores MOT's importance.  MOT's essential nature arises because it is the compulsory mechanism available to defendant to ensure compliance with its contractual and patient safety obligations.

---

[10] Although the language of her request encompasses an exemption from performing two shifts within a twenty four hour period (e.g. the Monday 3-11 shift followed by the Tuesday 7-3 shift), MHM, per Whitney's chronology, did not so treat the request at the time, and now both parties argued the motion on the premises that Willard sought only exemption from MOT.

Willard's second argument is that "Willard's job description does not identify MOT as a primary responsibility and [MHM's] list of essential functions does not list MOT." Doc. No. 56 at 6; see Doc. No. 60-9 at 1; 60-11 at 19, 23; 62-11 at 6-8. While these documents are evidence of whether or not MOT is an essential function, they are not dispositive. First, the major responsibilities documents flesh out expectations for nurses while working, as opposed to broader expectations. For example, such responsibilities include "[p]rovid[ing] direct and indirect nursing care," and "[u]s[ing] current knowledge to promote a safe environment for providing health care to patients." Doc. No. 60-11 at 23. These benchmarks guide nurses while they are at the job; they do not describe when the nurse should be working. Further, Willard is incorrect about what MHM lists as essential functions. One essential function is "[r]eport[ing] to work on time and is at work as scheduled, as observed by the supervisor." Doc. No. 62-11 at 7. This clearly indicates that compliance with work schedules, including those set via MOT, is an essential function. And third, MOT's inclusion in the CBA also militates towards finding it, as a matter of law, an essential function. See Laurin v. Providence Hosp., 150 F.3d 52, 60 (1st Cir. 1998) ("Section 4.05 of the CBA likewise supported the Hospital's judgment that shift rotation is an 'essential function' of a daynurse position in its maternity unit."). This is particularly so where, as here, the CBA embodies a neutral, non-discriminatory provision and Willard makes no contention otherwise.

In light of the above, the Court holds as a matter of law that exempting Willard from MOT for an indefinite time period is an unreasonable accommodation that MHM did not have to grant.[11] First, the First Circuit has consistently held, including in the nursing context, that

---

[11] Willard disputes that she requested a permanent exemption from MOT, instead claiming it would simply last until her doctor cleared her. Doc. No. 56 at 6. Given that there was no indication of when Willard's doctor would clear her, this ultimately is a distinction without a

employers do not have to violate the CBA, as excluding Willard from requisite MOT does, to comply with the ADA.  See id.; accord Fiumara v. President and Fellows of Harvard Coll., 327 F.App'x 212, 213 (1st Cir. 2009) ("An accommodation that inherently breaches existing employee agreements is not a reasonable accommodation.") (citing Laurin, 150 F.3d at 56-61); see also Shea v. Tisch, 870 F.2d 786, 790 (1st Cir. 1989) ("[W]e . . . conclude that the [employer] was not required to accommodate plaintiff further by placing him in a different position since to do so would violate the rights of other employees under the collective bargaining agreement.").

Additionally, as Willard herself acknowledged, her failure to work overtime would require another employee to work that shift instead.  Doc. No. 66 ¶ 102.  The First Circuit has explicitly held that "[t]he ADA does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous."  See Feliciano v. Rhode Island, 160 F.3d 780, 785 (1st Cir. 1998) (emphasis added).  And, finally, Willard admitted that "[a]llowing [her] to not work overtime would have resulted in a significant financial burden on MHM."  Doc. No. 66 ¶ 104. For these reasons, MHM did not fail to offer Willard a reasonable accommodation when it denied her an indefinite exemption from MOT, and Willard, unable to perform the essential function of MOT, was not a qualified employee.  Accordingly, this theory of liability fails.

2)      Disparate Treatment-Termination

---

difference—MHM still faced the prospect of Willard being unavailable from MOT shifts for an indefinite period of time. Willard did not, for example, request relief for a time delimited period. And neither the letter from her medical provider nor the circumstances suggested a looming reevaluation or change.

For Willard to prevail on her claim that MHM "terminated [her] because of her disability," Doc. No. 5 ¶ 65, she "must first make out a three-factor prima facie case." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012).  Willard "must show that [s]he (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of h[er] job with or without a reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of h[er] disability." Id. at 87.  If she does, "the burden then shifts to [MHM] to articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason[,]" at which point Willard then must "proffer evidence to establish that [MHM's] non-discriminatory justification is mere pretext, cloaking discriminatory animus." Freadman, 484 F.3d at 99.

Willard cannot prevail on this claim for the same reason she cannot prevail on her reasonable accommodation claim.  As explained above, she has not demonstrated that she can perform the essential function of MOT.[12]  Therefore, she cannot make out a prima facie case of disparate treatment.

   3)      B2 RN Claim

In her opposition, Willard alludes to a third discriminatory act—MHM's refusal to hire Willard for the B2 RN position because it regarded her as disabled.  "Regarded as" claims receive similar analysis to disparate treatment claims because a plaintiff can show that she is

---

[12] This is so even assuming the CBA precluded MHM from terminating Willard until her third refusal to perform MOT within a twelve month period, notwithstanding Willard's assertions: (a) that she was not exercising her rights under the CBA; and (b) that she would not perform MOT because in order to prevail on her claim Willard must establish she is a qualified individual.  On the record before the Court, she cannot do that because she cannot perform the essential function of MOT.

disabled, for purposes of a prima facie case, if she "is regarded as having such an impairment."
Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008).

This claim fails for the same reason the other two fail—Willard cannot demonstrate that she could perform the essential MOT function of the job. Her only response to this contention is that she would not have applied for the B2 RN job if it would not comport with her requested accommodations. See Doc. No. 66 ¶¶ 59, 61. However, in contrast to MHM, which offers Whitney's affidavit, Doc. No. 54-1 ¶ 37, and Willard's own admission that Whitney never told her the B2 RN position did not require MOT, Doc. No. 55-3 at 43, Willard does not put in any evidence that the B2 RN job, unlike her old job, did not require MOT. In light of this evidentiary absence, Willard cannot make out a prima facie case for this theory. Accordingly, the motion is ALLOWED for Count I.[13]

B.     Count II—Retaliation Claim

Willard's second claim for relief is that MHM retaliated against her for engaging in protected activity. See Doc. No. 5 ¶ 67. On March 12, 2012, she "sent an email to Whitney complaining of harassment, discrimination and retaliation because [MHM] was forcing [her] to work mandatory overtime against her physician's orders and she was going to file a complaint with the EEOC." Id. ¶ 67(G); see Doc. No. 66 ¶ 77 (establishing the date the email in question was sent). She alleges that MHM terminated her "the next day in retaliation for sending the email." Doc. No. 5 ¶ 67(H). Discovery has revealed that Willard was suspended without pay on

---

[13] To the extent Willard claims that MHM could have reasonably accommodated her by transferring her to the B2 RN position, that argument fails for similar reasons. MOT was an essential function of the B2 RN job. Accordingly, MHM would have faced the same burdens for accommodating her in that role that they would in her previous position, and Willard still would not be qualified for that job.

March 13, 2012, but was not formally terminated until March 22, 2012, nine days later.  Doc. No. 66 ¶¶ 78, 87; Doc. No. 62-3 at 4.

Willard's "retaliation claim does not depend on the success of her disability claim." Jones v. Walgreen Co., 679 F.3d 9, 20 (1st Cir. 2012).  "To make out a prima facie retaliation claim, [Willard] must show that: (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action."  Kelley v. Correctional Medical Services, Inc., 707 F.3d 108, 115 (1st Cir. 2013).  Willard has met this burden.  Sending the email, especially in the context of her request for accommodations, was protected activity.  Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003) ("Reporting . . . harassment or initiating a charge of . . . harassment is a protected activity under Title VII); see Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) ("Wright's request for accommodation constituted protected activity . . . .").  And "suspension undoubtedly constitute[s] an adverse action."  Bishop v. Bell Atl. Corp., 299 F.3d 53, 60 (1st Cir. 2002).  MHM's papers have assumed as much.  See Doc. No. 54 at 16.  Finally, in making out a prima facie case, "[v]ery close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection."  Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc., 673 F.3d 1, 15 (1st Cir. 2012).  As Willard was suspended one day after sending the email, and terminated only nine days after that, she has made out a prima facie case of retaliation.

Since Willard satisfies her initial burden, MHM "must articulate a legitimate non-retaliatory reason" for its decisions.  Kelley, 707 F.3d at 115.  Its asserted reason is that Willard could not perform the essential functions of her job, including MOT.  This reason fulfills MHM's burden.

Having proffered this explanation, Willard "must show that the proffered legitimate reason is pretextual." Id. Because "temporal proximity on its own is insufficient to establish pretext, it is relevant evidence that, combined with other facts, may support such a finding," Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 10 (1st Cir. 2012), Willard needs additional evidence to survive summary judgment. Contrary to MHM's assertions, Doc. No. 65 at 6, Willard has more than just proximity. Cantelli testified that she could not remember MHM terminating anybody for refusing to do MOT for three times. Doc. No. 62-6 at 35. Accordingly, a rational factfinder could find Willard singled out for conduct that typically does not result in termination, and could find her protected conduct the cause. Additionally, Willard's attendance, while a potential problem given her requested accommodation, had not manifested itself at the time MHM fired her—she had only missed two days since coming back to work (an amount of time within the number of sick days Willard accurred from her work during this period). Doc. No. 62-7 at 2-6. Thus proximity, when combined with these other two facts, creates a genuine dispute of material fact over whether MHM had retaliatory animus when it suspended, and then terminated, Willard. Therefore, the motion is DENIED for Count II. [14]

---

[14] Willard also alleges that MHM retaliated against her by "only pay[ing] her final wages if she signed a settlement agreement waiving legal claims and statutory rights." Doc. No. 66 at 61; see Doc. No. 62-3 at 3; see also Doc. No. 5 ¶ 67(J) ("The Defendant demanded the Plaintiff sign an indemnification and promise not to file a complaint with the EEOC or any other governmental agencies in return for receiving the moneys owed to her by the Defendant."). This agreement pertains to "payment for the period when [she] was placed on leave without pay until the date in which [she] state[s] that [she] received [MHM]'s letter of termination." Doc. No. 62-3 at 4. She did not press this argument in her opposition. See Doc. No. 56 at 10. Further, as Willard has produced no evidence that she was entitled to pay during this period, she has not suffered an adverse employment action, this basis for retaliation fails.

C.      Count III-Intentional Infliction of Emotional Distress

Willard's third claim against MHM is intentional infliction of emotional distress

("IIED").  Doc. No. 5 ¶¶ 69-74.  She did not, however, oppose MHM's motion for this count.

Doc. No. 56 at 3.  Nevertheless, because "[i]t is well-settled that 'before granting an unopposed

summary judgment motion, [this Court] must inquire whether the moving party has met its

burden,'" Aguiar-Carrasquillo v. Agoso-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) (quoting Lopez

v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1517 (1st Cir. 1991)), the Court

addresses the claim on the merits.  And as a matter of law, this claim fails.

There is no dispute that Willard's allegations stem from MHM personnel acting within

the scope of their employment.  Because "Massachusetts workers' compensation law bars the use

of [IIED] by an employee (or former employee) against coworkers or employers acting within

the scope of their employment," McArdle v. Town of Dracut/Dracut Public Schools, 732 F.3d

29, 37 (1st Cir. 2013) (citing Mass. Gen. Laws Ann. Ch. 152, § 24), this claim fails as a matter of

law.  Thus, the motion is ALLOWED for Count III.

IV.     <u>CONCLUSION</u>

For the reasons set forth above, the Court ALLOWS IN PART and DENIES IN PART MHM's Motion for Summary Judgment (Doc. No. 53).

The Court will hold an initial pretrial conference on November 30, 2015 at 3:00 p.m. Counsel shall be prepared to discuss (a) whether all parties consent to trial before the magistrate judge; (b) the scheduling of a prompt trial; and (c) whether mediation, either in the Court's ADR program or otherwise, is of interest to the parties.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge